Good morning, your honors. May it please the court, I'm Ron Grassi and my wife is seated to my left. We're here in pro se capacity. I would like to speak for approximately 10 minutes and then reserve the remainder of my time for Sir rebuttal. I would like to discuss the main issue of our case and on the appeal, which is the question of duty. There are other procedural issues which I believe can be resolved if we're allowed to amend our complaint. However, the question of duty is paramount in this case. I would like to first start with the concept in California of assumption of duty. This circuit needs to and does study California substantive law. And the doctrine of assumption of duty is well ingrained in California law. Basically, it's a very brief codification of the restatement section 323, and it really embraces the situation where a party that does not owe a duty to a third party offers services anyway to protect that third party in one form or another and does so negligently. That becomes the assumption of duty doctrine. That doctrine, as it relates to the rating agencies, is as follows. Is that like a good Samaritan rule? I'm sorry, the restatement of what? The restatement of torts. Of torts. Okay. Second section 323, which is in our, in a substantialized. But the assumption of duty that you seem to describe the services to a third party is the kind of thing that sounds like the good Samaritan rule, where you stop along the side of the road and. Correct. And help somebody if you break their leg in the time. That's part of it. That's part of it. However, the doctrine itself does not relate to just personal injuries. In fact, if the Court would have the time later to review the citations that support section 323 by the drafters of that section, approximately half the examples given are financial loss. And I will just mention briefly some financial loss situations, one of which this Court itself was involved in. So my view is that the rating agencies did not initially owe us a duty. Their duty was to their client to rate the bonds, and that would be it. However, they then went one step further voluntarily and gave default advice of bonds to the public, the public looking for bonds. And that is pursuant to section 323. I have discussed that issue in our first amendment complaint at page 14, line 4 to 15. It's also raised at the hearing before the district court on July 9th at page 21, line 1823 of the transcript. By assuming the duty, they also therefore assume the risk of being sued by the parties to whom they're reaching out, and they have to be giving non-negligent, non-fraudulent advice. Otherwise, they may get sued. That becomes the risk that they have to face. The parties – I'll move on to this point over here. Well, not just any member of the public can sue, though. Correct, Your Honor. It would be parties who are envisioned, who are the focus of the acts of advice by the rating agencies, and they're advising bond investors. So any bond investor can sue? Any bond investor, because that's their target. I realize that's a broad class, and I'll come back to the fact that it's broad class is not a disqualifying factor. However, if they're advising bond investors, and they are on the Internet, through all of the efforts they take with the brokerage firms, if they give their ratings and say, we have done an exhaustive study, which their websites explain what the exhaustive study is, and then they say the result of our exhaustive study is that this bond deserves, and then, for example, it might be AAA, it might be AA, it might be A, it might be junk bond. At that point, bond investors who need advice may very well rely on that advice, and if so, if the advice is incorrect, they may sustain a substantial financial loss. Dean Prosser has explained the doctrine as follows. If the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act and will thereafter be liable for negligent acts. California follows this doctrine in several cases. One of the more recent ones I have cited by way of a request for this Court to take judicial notice of Van Horn v. Watson, but also of Valdez v. Taylor and many other cases, plus the cases that are cited by the reporters of the restatement. This Court, the Ninth Circuit, has approved and followed this doctrine in several cases, such as Varig Airlines v. USA at 692 Fed Second 1205. That was a situation where an airline went down, an airplane went down, owned by Varig, and Varig asked for financial damages for the loss of the airplane. I've also forwarded the Court a decision made three weeks ago by the Central District of California, Gerbery v. Wells, where Wells Fargo went beyond its traditional role of a financial lender and gave actual advice on a particular to a particular party on what to do to qualify for a certain refinancing. And then when the client therefore defaulted upon that advice, they then took a default of that party's property. That would be one doctrine I would like to, for the Court to consider. The second point, Your Honor, is that I believe we are third-party beneficiaries. And again, we're back to the restatement. This time, Section 552, this is discussed extensively by both parties in their respective briefs. And then my view is that there has to be an analysis made of who the information provider is trying to reach. And the language typically in most of the appellate cases is who is the intended beneficiary of the advice. The appellate cases then struggle with different ways to figure out that answer because we're talking about what is the party's intent, which is the subjective analysis to a certain extent. The best single test, which starts in 1922 with a Cardozo decision called Glanzer and then goes on to many other cases afterwards, Biaconga, California Supreme Court, Biley, it's in the Biley case, is what's called the end-and-aim test. What is the end-and-aim of the ratings? That's the information being provided. They're obviously, this is a question of common sense, who are the rating agencies trying to reach? Why are they publishing to, as the defendants would say, the world? Well, they're trying to reach bond investors. That's common sense. It's more than common sense because if we go to the websites of the three rating agencies, we learn that the rating agencies admit that's exactly who they're trying to reach, Standard & Poor. Their website entitled, Standard & Poor's Website Guide to Credit Rating Essentials, Who Uses Credit Ratings Says Investors Most Often Use Credit Ratings to Help Assess Credit Risk. Fitch, to the same effect, saying, Credit Ratings Are Used by Investors as Indications of the Likelihood of Receiving the Money Owed to Them in Accordance with the Terms on Which They Invested. We also have, and I've set forth in my brief at the district court level and also in my brief before this court, I've set forth samples of testimony by the three CEOs of the three rating agencies, Stephen Joint, Fitch. The role of a rating agency is to gather and analyze a variety of financial, industry, market, and economic information. Okay. Excuse me, Mr. Garza. I don't like to interrupt your argument. That's fine. But I just wondered, which of you are you going to address how you and your wife were affected by these? Yes. I'd be very glad to explain if you want the factual basis. It's also set forth in the first amendment complaint. But we're retired. We wanted to purchase safe bonds. I called my broker, explained the parameters of what I was looking for. My broker got back to me within about three or four days, read off three or four potential bonds, one of which was rated. That's very important to a retired investor. Why? Because you first wonder why weren't the other bonds rated? What was wrong with them possibly? Number two, being told that your bond, your potential bond that you're thinking of buying has been rated investment grade, which is what we purchased, tells the potential buyer, such as ourselves, this is not likely to fail. You will likely get your money back. And that is what retired people want to have. Were you told by your broker which agency had rated the bonds? Yes. All three. And your broker specifically told you? Yes. All three had rated? Yes. In fact, in fact, if he had said to me, well, only two have because one has refused to, well, that would make me wonder why there was a refusal. But so I relied on that advice. And as I pointed out, the three CEOs have testified before Congress. They have said that the investors are their target. Their websites say that they are the target. Now, with this, with respect to this, the rating agencies have a defense. They say this is just too large a class. One of the counsel here always likes to say this is the world that's going to sue us. It's not the world that's going to sue. It's going to be bond investors if they were given negligent or fraudulent advice. That's who might sue them. But, frankly, it would have to be a large enough bond to make it worthwhile or have a plaintiff who just simply wants to see. Counsel, I know you were trying to reserve five minutes. You're down under four. But before you step down, I need you to address the Rule 8 and Rule 9 problems here, the plaintiff problems. Okay. On the Rule 8 and 9 is that Peterson, Verso, and other cases I have cited suggest that my negligence claim, negligent misrepresentation, should not have been held to the higher standards of 9b. Other district court decisions in the Ninth Circuit say that the ---- Well, the magistrate in the district court adopted this, said that the questions of fraud were pervasive and, therefore, it would have to be subject to Rule 9. And it does appear to be that your complaint from top to bottom alleges fraud. Well, the majority of examples I gave of my First Amendment complaint were negligence, actually. And then I did incorporate by reference those statements, those examples of what the analysts very likely missed when they reviewed ---- Your language. I reviewed your First Amendment complaint this morning. The language in your First Amendment complaint certainly is the language of fraud, that these were willful misrepresentations. Well, I agree that, actually, I do believe that very likely they had to see what I saw, which is after the fact, that Lehmans was sitting on hundreds of millions of dollars of non-sellable, non-movable mortgage-backed securities. Your allegation is that they were in bed together on this one? Correct. That this was in the ---- Right, right. Right. However ---- To rate the bonds in this one.  But I'm spending more time on duty because that was the ultimate issue of the court was to ---- But you've got some severe pleading problems here as well. Fine. And ---- And that was an independent basis for the district court's decision. Right. Moving to the pleading problem for a minute, and without jeopardizing too much of my time, I'll say this, that the ---- well, actually, what I'd like to do is, if I could, is reserve my time. I'm concerned that ---- I'd really like you to answer my question now, if you would. That would give them an opportunity to respond to it, and then I'll give you some time to ---- for rebuttal. But I think that I'd like an answer to my question. You've had an opportunity to amend this complaint. The district court told you the first time what it thought the problems were under Twombly and Ickes Hall. Correct. The problem was the court primarily wanted more specificity. Right. And there is no specific information available from any third-party source, such as LexisNexis or Google or the Internet, regarding my bonds. So I spent the majority of my first two oppositions, plus my first complaint, just trying to address the habit and custom of the rating agencies. Right. But if you haven't got ---- Because I couldn't prove the specificness. If you don't have the specifics, then how can you satisfy Rule 9? And even Rule 8, after Twombly and Ickes Hall. I believe ---- I believe I can satisfy under Wool, which I've cited to the Court. There are ---- Wool and Peterson. There are appellate cases in the Ninth Circuit that make it clear that on occasion ---- rare, but they're on occasion. A litigant will not know all the facts in the beginning. And I'm saying that this is one of them, because the really great information which I'm sure you will ---- Mr. Graffert, I couldn't even find any dates or any names of any of the defendants in your complaint, other than as the most general, that is, rating agencies generally do this. Actually, I've named the three defendants in the complaint. Oh, I know that they were named. Clearly. They were named. The date of the purchases of the bonds, the location of where it was purchased. But I can't be ---- but I can't say to you that a particular analyst working for one of the three rating agencies did or did not see something because there is no such evidence available to the public. How can you prove fraud? And if you can't even allege the fraud, then you can't prove the fraud. Well, the most I can do is, by way of circumstantial evidence, by pointing out that the evidence available from a qualified analyst in trying to come up with a rating is that they would review the financial statements and see hundreds of millions of dollars of mortgage-backed securities, which could even be sold to third parties. This allowed your complaint to go forward. Don't you ---- aren't you asking for sort of the world in terms of discovery? I reviewed your brief again this morning as well, and your brief seems to suggest you haven't got this evidence, and you don't think you can get access to it unless you're permitted discovery. Well, I ---- Correct. Because you believe that the parties have it, which is very natural in a fraud. That's part of the problem with the fraud is that usually it's been disguised. But that is also the challenge of pleading fraud, is that you have alleged ---- you know, that's why we have a heightened pleading standard there, because this is a very, very damaging allegation to make, and that's why we require some specificity. I understand the reasoning behind Iqbal, Twombly, and 9b. I'm not disagreeing with the general use of those requirements. However, I'm saying that unique to a fraud case such as ours, there is no ---- I've even called witnesses who have left these three agencies trying to find out if for some reason they have a copy of the analysis, for example, if any. Did you contact any people who have left these agencies?  Did you come up with any evidence? No, because they don't ---- they didn't ---- they don't have any. They don't have any because I can't find an analyst because I don't have access yet, if at all, to their identity. You know, the idea of letting you go forward on this and then arming you with subpoenas or something from the court to do discovery sort of makes you sort of the ombudsman general for a very bad incident in our nation's financial history. Well, there's no question it's a very bad incident. I wonder whether that might be better left to the SEC or to U.S. Attorney's offices. I wish you were right about that. In fact, had the Department of Justice or the SEC, in fact, taken an affirmative role, quite honestly, I very likely wouldn't be here. It's not like I spent five years of my life to recover $40,000. Nobody else is pursuing the rating agencies involving individual investors. This is not a class action. I have no intent of making it a class action. I would like to have the rating agencies held accountable. And I've read enough on the Internet about what the rating agencies did or did not do. Your Honor, I'll leave you with one last point. I don't even know if my bonds were analyzed, even though the websites say that all bonds get analyzed before they get rated. It may very well be because they were presented back, especially in 07, 06, with thousands of bonds. The only time they had with their limited manpower was to negotiate fees for each rating. And how would you feel if I told you I have rock-solid proof that my rated bonds weren't even analyzed? Then you'd be impressed. The problem is, I don't know that. Thank you very much. I'm going to allow you some time. I've taken quite a bit of your time, and I know you were trying to reserve some time. I will allow you time for remodeling. Thank you very much. Let's hear from the agencies. Good morning, Your Honor. I'm Floyd Abrams for the McGraw-Hill Company. My colleagues and I have agreed that I'll have ten minutes. They've each reserved two and a half, and the reason for that is reflected, I think, in Mr. Grassi's argument already today. Among the many pleading violations here is that he didn't divide up between us what it is he says we did wrong. That is to say, he didn't say Standard & Poor's did that on that day or that Moody's did some particular wrong, which maybe he doesn't even think my client did or that Fitch did. So Moody's and Fitch will speak for themselves as they think appropriate, even though I think what I'm going to say will cut across the board. The first thing I'd like to say is that Mr. Grassi's reference to Section 323 is not only inapt but was not made below, is not in the briefs to this Court. The only section of the restatement he cites to this Court and appropriately cites to this Court is Section 552 of the restatement, which is the one which deals with duty. And California follows Section 552. New York, the other potential state in terms of what law governs, does not. In New York, we require privity or near privity, and the case I would recommend to you on that is the recent Anschutz case, which we furnished to the Court from the Second Circuit, decided in 2012 after the briefing was completed. I don't think Mr. Grassi maintains that there was anything like privity. Under California law, which I'll turn to, though, it's not quite the same as New York. California law does allow in certain narrow circumstances a case to be brought up for negligent misrepresentation in a situation where an entity or a person or a couple such as the Grassi's are part of what the Biley case called a narrow and circumscribed class. There are a lot of cases about that, but one thing I think is clear is that when you say I'm a member of the public, and that is what he said in his complaint, that's not a member of a class. Sotomayor, you're not arguing that under – are you arguing that under California law someone who invests in bonds that are rated by an agency, those who invest in the bonds on the basis of the rating of the agency, that they – that the rating agency has no duty to those people? I mean, I understand that. What I'm arguing is that I must not – I didn't say that very well. No. No, I get it. I just have to give a sort of nuanced answer. There are situations, private placements, the sale of certain types of rated entities in which some courts, not all, have held that if only people who have over a certain income can invest, that that might be a narrow and circumscribed class because it's not the world. What I am saying, though, is that the Grosse's, as their brief urges, as members of the public, or as Mr. Grosse just urged to you, members of the public, in effect, who would like a safe and successful and conservative, a word he used in his brief, investment, that that does not fit. And those people cannot sue a rating agency with which they have not been in touch, to whom there has been no direct contact, or the like, because that's not a narrow and circumscribed class. And what the Biley case is all about is how to limit the potential of what they call multibillion-dollar liability of entities that speak to the world, as in this case. So our position on duty, then, is that even though New York and California law is not the same, they come out the same way, that whether one is thinking of privity or one is thinking of a narrow and circumscribed class, it just isn't here, and therefore that he's failed to state a claim for negligent misrepresentation. On the fraud side, I'll only say in the most general way that, as you heard from Mr. Grosse's responses to questions, he doesn't have anything. I mean, he's obliged under Rule 9 to come up with so much more than he's come up with. It's not just that he didn't separate us out. It's that he didn't tell us what we did that was wrong apart from the ratings, which he said have led to his losses. So my view in our submission on this is that for the reasons stated below by the magistrate and adopted by Judge Mendez, that both in terms of Rule 9 and Rule 8, that they are really not, not even close. Well, let me go back a minute, because we don't see you here very often, Mr. Abrams. Let me ask you another question, try to get at this again. Let us say that there is the allegation that the plaintiffs, in reliance on the rating given by your client, purchased the bonds and that the rating was made negligently because the agency omitted to take into account something that has been known and taken into account. Does that – would that suffice to, in your view, to set forth a negligent representation claim? No, it would not. Why not? Because in the service of protecting against this multibillion-dollar liability, and there could literally be that if all the grosses in the country – I mean, this could have been a class action, there's nothing special about their investment as distinct from the rest of the world – if anyone, anywhere who read a rating – yes, ma'am. They say that they relied on your rating. I mean, that's not the same as the whole world. I accept that the proposition or the argument of that they did. He says he did. There's no reason to disbelieve it. And you ought to assume it. What I'm saying is that, no, it doesn't state a claim, and that's – it doesn't state a claim for the reasons that the highest courts in California and the highest appellate courts in New York have said this is not a risk we're prepared to take. We're not allowed to let you sue accountants, even when the accounting material goes out to the world, unless you have some relationship with them, or you're a member of a group that's – I don't even want to say small enough. The language of Biley is very precise, narrow, and circumscribed, because but for that, you know, newspapers say things. They say things about stocks. Kramer on television talks all the time about stocks. If he is negligent, for our purposes I assume negligence, if he's negligent in the work he did to prepare his recommendations, he can't be sued by anyone, that is to say everyone, who watched that television program and brings a lawsuit. Well, he isn't – who pays your client? As a general matter, they're paid by the entities that they rate. Right. Which is disclosed fully. Right. But, yes. So Kramer isn't paid by any – I hope not. I hope not. I hope he would tell us if he were. Thank you very much, Your Honor. My colleagues. May it please the Court. My name is Martin Flumenbaum. I'm a member of Paul Weiss, Rifkin, Wharton & Garrison, and I represent Fitch. Fitch is the smallest of the three largest rating agencies. We are competitors with S&P and Moody's. I wanted to simply highlight on behalf of Fitch the fact that the first amended complaint mentions Fitch only three times, once when it identifies it as a defendant, one in an article which it quotes in which it says we are competitors, and then the third time is only when the fact that we rated the two Lehman Bonds at issue one in 2004 and one in 2008. There are no allegations that relate to Fitch in particular. There's no e-mails that are cited that relate to Fitch in the supplemental materials that have been submitted to the Court. There are no allegations on which there can be a basis for either duty or fraud based on the complaint as submitted. Thank you.  Good afternoon. Good morning, Your Honor. I'm Jim Koster from Satterley Stevens for Moody's. I would join in the arguments that have been made already, and I would point out that Moody's is not the subject of those supplemental submissions either. And if the Court has any questions specifically as to Moody's, I'd be happy to answer those. Otherwise, we'll join in. Thank you. Thank you, Your Honor. Your Honor, I just have six very quick points. Number one, correct. I have not set forth claims separately stated for each of the three defendants. I said the defendants and each of them. However, if that's not sufficient, I have a word processor. I can repeat the claims three times. Right. But here's the point, Mr. Rossi. This is where the rubber meets the road when it comes to a fraud claim. You've now had two opportunities to say Moody's did X, S&P did Y, and therefore and that constitutes a fraud. You had an opportunity to see if there was a whistleblower someplace or to find an analyst who was willing to talk to you to say you won't believe what I saw and here's what happened. But you have no idea whether you've pled it now as one big hole as though the errors that were made at each place were exactly the same error in each place. And I do contend all three made the same mistake. For example, they're looking at a financial. How could they possibly know that when there's no date, time, place, name, nothing? Well, I don't know exactly when the analysis is supposed to occur before each rating, but I'm assuming one to several weeks before. I don't know the names of the analysts who were employed, but when you look at the financial statements, if they reviewed them, I don't know that, so I'm not going to mislead the Court. If they reviewed the financial statements, they would see an underwater corporation facing bankruptcy, which, in fact, is exactly what happened a year later. But if I could just respond to certain points. On Section 323, Mr. Abrams suggested it's not in my complaint. It's actually there at page 14, line 4, where I discuss the voluntary nature of what's happening by the rating agencies. And this is what happens when you voluntarily go beyond your duty and start advising third parties, and you're wrong. Next, Your Honor, very important on Biley. I meant to discuss this earlier. Biley is not a rating agency case. Biley is a simple audit case where an accounting firm does an audit report of the client's records and gives the report back to the client, period. They're not involved in any marketing, for example, on behalf of the client. The Court in Biley even said it was only reviewing an independent auditor's audit report. It never once said, and this shall apply to every single information provider under every circumstance. In fact, such remark would have been obitur dicta, I think, in that case. What was before the Biley Court was strictly an audit report. Then that's why I don't think it applies to what a rating company does, which is they've done their report to their client, and now they go out to the public and advertise. That's not covered by Biley. Next, Your Honor, I'd like to ‑‑ they're saying that ‑‑ they were asked the question whether they're saying that they do not owe a duty to anybody. And I partly agree with what Mr. Abrams said, but basically the average investor in America is an individual who buys a $20,000 or $40,000 or $100,000 bond. We're not a pension plan or whatever. And so none of us are covered. We're not covered. We don't have a relationship with the rating agencies. The big guys, the big pension plans would. They would bring in the rating companies, and then they'd get bad advice, possibly, and they'd sue them for, in essence, malpractice. But in the vast majority of cases, there is no such relationship that exists. And so what Mr. Abrams is really saying is this is a wrong. We're assuming a 12B6 setting. This is a wrong for which there really is no remedy. It's just tough. As far as the Anschutz decision, and, again, Mr. Abrams is back to this theme that I'm publishing to the world or to the large public and, whoa, it was me. Well, the answer is the Anschutz case, which he mentioned, specifically covered that point because this argument was the same argument that the rating companies made in the Anschutz court, which is in the Ninth Circuit. It's one of the district courts, said they were concerned about the possibility of tens of thousands of litigants. And the answer was that's not an issue. That's what Judge Olson said. It's not an issue. It's the wrongdoing that's the issue. So size is not really the question. That's it. I'll be glad to answer any other questions you have. Are there any other questions? Thank you very much. We thank all counsel for the argument. Justice Smoody is submitted for decision. And the next case is United States v. Alcantara.
judges: Beistline, Schroeder, Bybee